1   Linda D. Friedman (*pro hac vice* application forthcoming)
    Jared A. Calvert (*pro hac vice* application forthcoming)
2   STOWELL & FRIEDMAN LTD.
    303 W. Madison St., Suite 2600
3   Chicago, Illinois 60606
    Telephone: (312) 431-0888
4   lfriedman@sfltd.com
    jcalvert@sfltd.com
5

6   Sam Sani (SBN 273993)
    SANI LAW, APC
7   595 E. Colorado Blvd., Suite 522
    Pasadena, CA 91101
8   Telephone: (310) 935-0405
    ssani@sanilawfirm.com
9

10  *Attorneys for Plaintiff*

11              **IN THE UNITED STATES DISTRICT COURT**
12   **FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

13  | | |
    |---|---|
14  | JOSEPH BRUNO, | CASE NO: |
    | | |
15  | Plaintiff, | **COMPLAINT** |
    | | |
    | v. | **Jury Trial Demanded** |
16  | | |
    | WELLS FARGO & COMPANY; WELLS | Hon. |
17  | FARGO ADVISORS, LLC; WELLS FARGO | |
    | CLEARING SERVICES, LLC, | |
18  | | |
    | Defendants. | |
19

20

21

22

23

24

25

26

27

28

# COMPLAINT

Plaintiff Joseph Bruno ("Bruno"), by and through his attorneys, Stowell & Friedman, Ltd., hereby files this Complaint against Defendants Wells Fargo & Company, Wells Fargo Advisors, LLC, and Wells Fargo Clearing Services, LLC (collectively, "Defendant" or "Wells Fargo"), and states as follows:

## JURISDICTION AND VENUE

1.    Plaintiff's claims arise under 42 U.S.C. § 1981, and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court also has diversity jurisdiction over this suit under 28 U.S.C. § 1332, because the parties are citizens of different states and the amount in controversy exceeds $75,000.

2.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendants reside in this judicial district.

## PARTIES

3.    Plaintiff Joseph Bruno is an experienced Financial Advisor ("FA") and former Wells Fargo manager of FAs who resides in Florida.

4.    Defendant Wells Fargo is one of the world's largest financial services firms. It is a publicly traded, global financial services firm, and Fortune 100 Corporation incorporated in Delaware, headquartered in San Francisco, and conducting business throughout the United States. In 2023, Wells Fargo achieved revenues of approximately $82.5 billion, a net income of nearly $19.1 billion, and market capitalization of $177.1 billion. Wells Fargo manages trillions of dollars of client assets and provides a wide variety of financial products and services to its global and domestic clients, who include corporations, governments, financial institutions, and individuals.

5.    As part of its brokerage, investment advisory, and financial and wealth planning services, Wells Fargo employs more than 11,000 people nationwide as FAs to service clients in thousands of offices throughout the United States. Wells Fargo Clearing Services, LLC, which does

business as Defendant Wells Fargo Advisors, LLC is registered with the Securities and Exchange Commission ("SEC") as broker-dealers and with the Commodity Futures Trading Commission ("CFTC") as futures commission merchants.

6.       Wells Fargo Clearing Services, LLC is a Delaware LLC with its principal place of business in St. Louis, Missouri. Its sole member is Wachovia Securities Financial Holdings, LLC, whose sole member is Everen Capital Corporation, a Delaware corporation with its principal place of business in North Carolina. Through a series of holding companies, Wells Fargo Clearing Services, LLC is a wholly owned subsidiary of its ultimate parent, Defendant Wells Fargo & Co.

## **FACTUAL ALLEGATIONS**

***Bruno Achieves Success as a Manager at Wells Fargo***

8.       Bruno worked for more than two decades as an FA and manager for Wells Fargo or its predecessors. After joining the firm as an FA, Bruno quickly ascended to management positions of increasing responsibility: Sales Manager, Producing Branch Manager, Regional Executive Manager, Complex Manager and finally, Market Leader. As Market Leader, Bruno was responsible for overseeing a market with 14 branches, 180 FAs, and more than $100 million in revenue.

9.       Wells Fargo evaluated its Market Leaders based on a variety of metrics, which focused on recruiting, retention, revenue, and compliance. Bruno excelled against these metrics as evidenced by his promotions. In particular, and among other things, Bruno was an extremely strong recruiter, consistently ranking high in the Florida region in recruiting. Recruiting is an essential component of success for high-level managers in the financial services industry, and Bruno excelled at convincing talented FAs with large books of business to join Wells Fargo. In every year he served as Market Leader, Bruno was in the top quintile (top 20%) in recruitment metrics and was one of the top three managers in the region or division in recruitment.

*Wells Fargo Racially Discriminates Against its Customers and Employees*

10.    Wells Fargo has a long history of race discrimination and maintains a corporate culture replete with harmful racial stereotypes and biased views about Black customers and employees. Wells Fargo is quick to support racial equity with money, such as investing in black-owned banks. And, it spends millions of dollars on advertising intended to convince the public that Wells Fargo is a diverse and inclusive Bank. While promoting[1] these symbolic efforts, Wells Fargo actually engages in systemic racial discrimination against its Black customers, borrowers, and employees.

11.    Wells Fargo's racial bias and discrimination is reflected in its racial redlining and other discriminatory practices against customers of color, as shown in numerous lawsuits and settlements. For example, in 2011, a jury found Wells Fargo guilty of systematically discriminating against minority home buyers by using a computer software for minority homeowners which resulted in them paying more for their home loans than white borrowers. *Opal Jones, et. al v. Wells Fargo Bank, N.A., et al.*, Case No. BC337821 (Los Angeles Superior Court) ($3.5 million verdict). Wells Fargo has also paid hundreds of millions of dollars to avoid litigating its discriminatory home lending practices. Indeed, Wells Fargo agreed to a settlement valued at over $440 million of a lawsuit challenging the Firm's redlining practices that resulted in a disproportionate number of foreclosures in Black neighborhoods in Shelby County and the City of Memphis. *City of Memphis and Shelby County, et al. v. Wells Fargo Bank, N.A., et al.*, Case No. 2:09-CV-02857 (W.D. Tenn.). Wells Fargo also settled a lawsuit for $37 million led by the National Fair Housing Alliance alleging that Wells Fargo took better care of foreclosed properties that it owned in white neighborhoods than those in Black and Latino communities. *National Fair Housing Alliance, et al.*

---

[1] Paul Best, *Wells Fargo Invests in Six Black-Owned Banks for Black History Month,* FOXBUSINESS, (Feb. 9, 2021), https://www.foxbusiness.com/markets/wells-fargo-announces-investments-in-six-black-owned-banks.

*v. Wells Fargo Bank N.A., et al.*, HUD Case No. 09-12-0708-8 (U.S. Department of Housing & Urban Development Office of Fair Housing & Equal Opportunity).

12.  Wells Fargo has also faced and settled numerous lawsuits challenging its "reverse redlining" practices of charging higher rates and imposing less favorable terms for minority home borrowers than for white home borrowers. For instance, in 2013, Wells Fargo paid $175 million to settle a lawsuit brought by the United States Department of Justice alleging that the Firm charged higher rates to its Black and Latino borrowers. *United States v. Wells Fargo Bank, NA*, Case No. 1:12-cv-01150 (D.D.C.).

13.  Further, Wells Fargo systematically and intentionally excluded Black applicants and customers from opportunities to refinance their home mortgages as nationwide interest rates dropped. According to a Bloomberg investigative report that analyzed data Wells Fargo reported to the federal government, in 2020, Wells Fargo approved only 47% of refinance applications completed by Black homeowners, compared with 72% of those completed by whites.[2] In 2021, according to the same analysis, Wells Fargo continued to have the lowest approval rate for Black borrowers of any major lender. Troublingly, Wells Fargo approved a greater share of applications from low-income white homeowners than all but the highest-income Black applicants.[3] Further, despite being well qualified to receive refinancing, high-income Black applicants had an approval rate about the same as white borrowers in the lowest-income bracket.[4] Wells Fargo denied the refinancing application of one Black man with a credit score above 800, in part because his home was in a predominantly Black neighborhood.[5]

---

[2] Shawn Donnan, Ann Choi, Hannah Levitt, & Christopher Cannon, *Wells Fargo Rejected Half Its Black Applicants in Mortgage Refinancing Boom,* BLOOMBERG, (Mar. 10, 2020), https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/
[3] *Id.*
[4] *Id.*
[5] *Id.*

14.     Wells Fargo's failure to extend refinancing and other home loans to Black applicants has drawn the attention of members of Congress. Senators Elizabeth Warren and Ron Wyden wrote a letter to Wells Fargo's Chief Executive Officer Charles Scharf excoriating the Bank for the "shocking disparity" in its approval ratings of Black refinancing applicants.[6] The Senators deemed Wells Fargo's actions consistent with "Wells Fargo's long history of scamming and mistreating consumers of color."[7] Furthermore, the Senators called Wells Fargo's treatment of Black borrowers "deeply concerning, no matter how one looks at the data" and concluded, "Wells Fargo appears to be simply unable or unwilling to stop preying upon customers of color."[8]

15.     Wells Fargo discriminates against its Black employees just as readily as it does its customers. In 2013, Wells Fargo was charged with segregation of its workforce by race and systemic discrimination against Black FAs in the class action lawsuit *Slaughter v. Wells Fargo Advisors*, 13-cv-06368 (N.D. Ill. 2013). Wells Fargo fought the *Slaughter* litigation for years, insisting that the class members had unwittingly given up their rights to a jury trial or class action litigation and were subject to mandatory arbitration agreements. Wells Fargo eventually settled the *Slaughter* litigation for over $35 million. *Slaughter v. Wells Fargo Advisors*, 13-cv-06368 (N.D Ill. 2013), Dkt. 99-1 (Settlement Agreement). As part of the settlement, Wells Fargo agreed to expansive programmatic relief embodied in a Consent Decree intended to reform its exclusionary and discriminatory practices. The Consent Decree approved by the Honorable Harry D. Leinenweber, United States District Judge for the Northern District of Illinois, promised reform in Wells Fargo's exclusionary hiring practices in addition to its discriminatory treatment of Black employees.

---

[6] Letter from Senators Elizabeth Warren and Ron Wyden, March 16, 2022 https://www.warren.senate.gov/imo/media/doc/2022.3.16%20Letter%20to%20Wells%20Fargo%20on%20Refinancing%20Discrimination.pdf
[7] *Id.*
[8] *Id.*

*Wells Fargo Engages in a Nationwide Practice of Conducting Fake Interviews with "Diverse" Candidates For Positions Which The Company Has Already Chosen a White Candidate*

16.     While fighting the *Slaughter* litigation on procedural grounds, Wells Fargo knew that the case's allegations of low representation of Black advisors and managers and a racially segregated workforce were true. Prior to the settlement, and in an effort to repair its image following adverse publicity surrounding the filing of the *Slaughter* litigation, Wells Fargo announced for its wealth management business a new policy requiring that at least four candidates be interviewed for any Financial Consultant ("FC") and Client Associate ("CA") position before the position was filled.

17.     When the policy was initially implemented, it did not require inclusion of diverse candidates, but Wells Fargo's Human Resources ("HR") representatives encouraged managers to expand the pool of applicants to include the talented diverse candidates it traditionally refused to consider.

18.     At some point in time, Wells Fargo's HR department clarified that the policy required that at least one of the four candidates interviewed for any FC or CA position be "diverse," echoing the National Football League's "Rooney Rule." Wells Fargo defined diversity to include race, ethnicity, gender, veteran status, disability status, and LGBTQ+ status.

19.     The interviews conducted under Wells Fargo's national practice of requiring interviews of four candidates (including one "diverse" candidate) for each open FC and CA position were often fake, fraudulent, sham interviews.

20.     For example, FC and CA positions are sales support positions who work for, and are often paid in part by, Wells Fargo FAs (or, more typically, teams of multiple FAs). As explained, *infra*, the decision to grow a team or alter the team structure is made by a high producing FA or FA team before there is any requisition for the position. Often, the pre-selected candidates were personally connected to the FA or FAs who are hiring them—for example, a family member, family

friend, personal acquaintance, or someone else, whom the FA knows and wants to "groom." They may also include persons on the team who have earned a promotion. Finally, the structure of a team may change at the whim of the team member, such as, an FA who reverts to an FC.

21.     The vast majority of Wells Fargo FAs are white, and very few are Black, so the overwhelming number of the candidates pre-selected to obtain an FC or CA position were white, and extremely few were Black.

22.     The decision about which FC or CA will be hired is often first communicated to Wells Fargo's HR department. In the most blatant example, a father might advise Wells Fargo that his son would be graduating from college and joining his team. Even though the pre-selected job exists only because there was a person who is pre-selected, i.e. the son, Wells Fargo's HR mandated and often sought out three other candidates (including at least one "diverse" candidate) to interview. The candidates believed that the interviews were real and that they actually had a chance to land the job. But Wells Fargo understood that this was not true, and that the three other interviewees, including the token "diverse" candidate who was selected only because of the color of his skin, have no real chance to obtain the position, regardless of performance in the interview, because the winning candidate had been decided in advance.

23.     Often, in addition to finding "diverse" candidates for the sham interviews, Wells Fargo's HR department also selected an interview panel of managers. The panel was informed in advance about which of the four candidates would be selected. For example, the panel would be made aware that a candidate is the son of the highest producer on the team and that but for the father's desire to hire his son, there would be no job to fill. Importantly, Wells Fargo did not prohibit this form of nepotism and defends it as part of the Firm's succession planning. Then the panel conducted pro forma interviews with the "candidates." The panelists were instructed to and must—if they want to avoid retaliation—fill out interview evaluations that gave the pre-selected candidate the highest score, regardless of the performance of the candidates in the interviews.

Alternatively, when hiring a pre-selected FC, Wells Fargo's HR department would often allow only the hiring manager, rather than a panel of managers, to interview the candidate. An offer would then be extended to the pre-selected and invariably highest-ranking candidates.

24. The practice of bringing in "diverse" candidates for fake interviews was extremely demoralizing and damaging to the careers of the individuals subjected to this practice. Importantly, and of concern to Bruno, the practice helped ensure that Wells Fargo made no progress toward increasing minority representation at the Firm. No matter the strength of their interviews, diverse candidates were inevitably rejected, causing them to doubt themselves and making them less marketable or likely to apply for future promotions.

25. In addition, Wells Fargo's HR system records that the candidate applied and was rejected for the position, labelling them as failures and decreasing their odds of being considered or selected for a future position.

26. To be clear, to the extent Wells Fargo's "diverse slate" rule might be considered a "Rooney Rule," it was not part of the *Slaughter* Consent Decree. Indeed, by the time Wells Fargo adopted its "Rooney Rule," there was sufficient evidence that the diversity experiment had failed in the NFL. Similarly, there was no reason to believe that the "Rooney Rule," though thoughtful in design two decades earlier, would eradicate discrimination in a culture resistant to change like the one at Wells Fargo. There was also strong evidence that the practice would continue to result in fake interviews, serving as a subterfuge for racial discrimination.

27. Despite the lack of evidence that simply adopting a rule requiring interviews of diverse candidates would result in an increase of hiring of diverse employees and/or any proof of success with the policy in wealth management, Wells Fargo doubled down on its version of the "Rooney Rule," expanding it from requiring the diverse slate in wealth management to mandating it across the entire Firm for high level positions. Then, in or around March 2022, Wells Fargo publicly announced a firm-wide policy mandating that under the leadership of CEO Charlie Scharf ("CEO

Scharf"), the Firm required diverse candidate slates and interview teams for all roles at Wells Fargo with total compensation of more than $100,000.

28.     Wells Fargo's "Rooney Rule" is fraudulent. In examples considerably less blatant than the father/son hire, Black and other minority candidates were systematically used to create a diverse slate for positions they have no chance of obtaining. As a result, the careers of the applicants and interviewees were damaged, while Wells Fargo maintained the disproportionately white financial advisory workforce it desired.

29.     Similarly, Wells Fargo continues to maintain a segregated workforce throughout the Firm where Black employees are overrepresented in lower-level Bank jobs but underrepresented in wealth management and executive level jobs.

***Wells Fargo Retaliates Against Bruno for Aggressively Championing Diversity Efforts and Challenging Its Practice of Subjecting Diverse Candidates to Fake, Sham Job Interviews***

30.     Bruno was extraordinarily dedicated to Wells Fargo and always strived to make the Firm more profitable and a better workplace. For years, Bruno was an active proponent of the Firm's stated efforts to increase diversity at Wells Fargo, believing the bank was losing out on well-qualified talent from which it would benefit. Bruno was also a principled opponent of Wells Fargo's nationwide practice of conducting fake, sham interviews.

31.     In late 2017, Bruno called John Alexander ("Alexander"), who was in charge of the entire branch network at Wells Fargo.

32.     During this conversation, among other topics, Bruno questioned Wells Fargo's practice of mandating that managers conduct interviews for positions in which the hiring decision had already been made.

33.     Bruno explained that it was unfair to diverse individuals who were being interviewed for positions they had no chance of obtaining. Bruno explained that requiring him to include diverse candidates in bogus interviews would also unnecessarily drain the pool of diverse candidates he was

seeking to hire not only by eliminating the candidates for false reasons but also by harming the Firm's reputation in diverse communities. At the time, Alexander agreed that the practice was "silly" and that he would address the issue with human resources.

34.     In early 2018, Bruno attended a dinner with Keith Vanderveen ("Vanderveen"), who had just been hired as Regional President of Florida and Bruno's new manager.

35.     Among other things, Bruno challenged Wells Fargo's practice of conducting fake interviews. Like Alexander, Vanderveen agreed the practice was problematic and said fake interviews "were done everywhere, but we will fix it," or words to that effect.

36.     During the third quarter of 2018, Bruno noticed no changes had occurred so again raised the issue of the fake interviews on a conference call with Alexander and Vanderveen.

37.     Bruno explained that he and his managers were "not comfortable" conducting interviews when the hiring decision had been made prior to the interviews. Alexander and Vanderveen responded that the process works slowly at Wells Fargo, but that they were still working on addressing the issue. Bruno shared his concerns and belief that such interviews were not only immoral and unethical, but also illegal. Vanderveen responded sarcastically, saying "look at Joe the attorney, are you running the legal department now?" or words to that effect.

38.     During 2019, Vanderveen held Bruno's annual review, at which Bruno again raised concerns about Wells Fargo's nationwide practice of conducting fake interviews of diverse candidates.

39.     This time, rather than paying lip service to the issue, Vanderveen threatened Bruno.

40.     Vanderveen sternly directed Bruno to "let HR and legal handle" the issues surrounding the fake interviews of diverse candidates. Vanderveen further instructed Bruno to stop talking to Vanderveen's supervisor Alexander about the fake interviews, because Alexander "did not have time" to deal with the issue or words to that effect. Vanderveen threatened Bruno's job,

ordering Bruno to "never go over my head on this issue," which he said was "the quickest way to get off my team," or words to that effect.

41.    Bruno was shocked and immediately understood the threat, asking Vanderveen directly if he had just threatened to fire him at his annual review meeting.

42.    In 2020, Bruno followed up with Courtney Garza ("Garza"), a subordinate and "right hand" of Vanderveen, about the fake interview issue.

43.    Bruno and Garza had a lengthy conversation about the fake interviews, and she admitted the practice was unethical and likely illegal. But when Bruno pressed Garza about Vanderveen and top management's unwillingness to curb the practice of subjecting diverse candidates to fake interviews, Garza flatly stated, "I want no part of this" because Vanderveen "said to drop it," or words to that effect. Garza referred to Bruno as a "dead man walking," or words to that effect, for pursuing the fake interview issue.

44.    Bruno continued to advocate for diversity and inclusion in his own market, which he believed was consistent with the law and in the best interest of Wells Fargo's business. Bruno put his full efforts into recruiting and supporting extremely qualified diverse, and especially Black, talent in his region.

45.    Bruno sent emails to his region promoting Black history and anti-racism efforts.

46.    He spearheaded initiatives designed—unlike Wells Fargo's fake interview scam—to actually bring in diverse talent to Wells Fargo and provide diverse talent with advancement opportunities.

47.    Bruno conducted large Zoom meetings with dozens of Black candidates and employees, aimed at recruitment and promotion opportunities.

48.    He networked with several diverse affinity groups within Wells Fargo as well as several outside organizations, including the Urban League, the NAACP, 100 Black Men, and 100 Black Women.

49.     Bruno created a mentorship program within his market to develop and promote women, Black, and Hispanic candidates.

50.     Bruno's efforts bore fruit. As a result of his networking, mentorship, and considerable investment of his time and his effort, he successfully created a diverse internal and external pipeline of Black recruits in his region.

51.     But Bruno's efforts to actually increase diversity at Wells Fargo—rather than implementing a fraudulent practice designed to create the false appearance of action—were met with the same hostility as his opposition to Wells Fargo's fake interview practices.

52.     For example, Bruno worked for many months to implement a best practice in his region of having interview panels consisting of 50% diverse candidates ("50/50") when he knew the job opportunity was real. Bruno also advocated that so long as the Firm allowed for pre-selection, exceptions should be made from the diverse slate requirement for those pre-selected hires. Importantly, Wells Fargo did not prohibit pre-selection of new members of FA teams.

53.     Bruno involved human resources leaders as well as his Operations Manager, Matt Glass ("Glass"), in his 50/50 initiative. While the HR leaders and Operations Manager expressed openness to Bruno's ideas in theory, yet in practice, they refused to implement them. Eventually, it became clear why. Wells Fargo leadership had no interest in achieving diversity and deemed his efforts to do so in his region to be "too aggressive." Both Garza and Vanderveen demanded Bruno "tone it down" with respect to diversity initiatives.

54.     During the summer of 2020, CEO Scharf responded to the racial justice movement sparked by George Floyd's murder by publicly announcing that Wells Fargo was committed to fostering a company culture that deeply values and respects diversity and inclusion. Nevertheless, shortly after making these proclamations, CEO Scharf ignorantly and openly exposed his true racist thoughts, saying that "[w]hile it might sound like an excuse, the unfortunate reality is that there is a

very limited pool of Black talent to recruit from." Understandably, CEO Scharf's comments led to a barrage of adverse press.[9]

55.    There was also fallout from CEO Scharf's comments with the Firm. For example, on a Zoom recruiting call, a Black prospective candidate challenged Bruno about this comment, asking why he should join a firm where top leadership viewed Black candidates and employees this way.

56.    Bruno responded (accurately)[10] that Scharf had apologized for his comments and acknowledged his implicit bias and said that the pool of qualified Black candidates is not small, and Wells Fargo should be more aggressive in finding Black candidates and mentoring its internal candidates.

57.    Vanderveen criticized Bruno for this response, asserting that Bruno had not sufficiently "defended" CEO Scharf and his racist comments. Bruno learned that CEO Scharf himself was upset by Bruno's response to the Black candidate on the Zoom call.

58.    Unbeknownst to Bruno, the Firm's public relations defense strategy was to divert the public from focusing on the Firm's lack of diversity by proactively touting its "Rooney Rule" as evidence of non-discrimination. As a result of CEO Scharf's divisive remarks, Wells Fargo shareholders identified as a key shareholder topic the Firm's diversity, equity and inclusion goals.

59.    On November 12, 2020, three institutional shareholders—the Comptroller of the City of New York on behalf of the New York City Teachers' Retirement System and Board of Education Retirement System, the AFL-CIO Reserve Fund, and the UAW Retiree Medical Benefits Trust— sent a shareholder proposal and supporting statements to the Firm. These shareholders intended to present for a vote at the upcoming annual meeting a proposal that the lack of racial and ethnic

---

[9] *Wells Fargo CEO's Comments About Diverse Talent Anger Some Employees*, CNBC, (Sept. 22, 2020), https://www.cnbc.com/2020/09/22/wells-fargo-ceo-ruffles-feathers-with-comments-about-diverse-talent.html

[10] Ken Sweet, *Wells Fargo CEO apologizes for comments about diversity*, AP, (Sept. 23, 2020), https://apnews.com/article/race-and-ethnicity-business-ap-top-news-charles-scharf-ca-state-wire-fa3ea27361567b3cf1f4c011467194ec

diversity among the most senior ranks at the Firm harmed the Firm's financial performance. These shareholders called for Wells Fargo to adopt a requirement that the initial pool of candidates from which new employees are hired by the Firm must include at least one ethnically or racially diverse candidate. Wells Fargo objected to the SEC and asserted that the proposal should be excluded because Wells Fargo already had substantially implemented the diverse slate requirement. Wells Fargo made these statements notwithstanding Bruno's objections and its knowledge of fake interviews.

60.    In January 2021, Wells Fargo reached an agreement with the shareholders, which included that Wells Fargo would require a diverse slate for new hires and provide more detailed disclosures on progress against diversity initiatives, including the diverse slate requirement. On February 23, 2021, CEO Scharf issued the Firm's 2020 Annual Report and highlighted that the Firm was requiring diverse slates of candidates for most roles.

61.    In early 2021, while CEO Scharf attempted to mediate a resolution with the SEC and shareholders, Vanderveen conducted Bruno's annual review with Garza on the line. The "official" performance review call was a short and straightforward one, as Bruno's objective performance was strong.

62.    After the "official" review ended, Vanderveen asked Bruno to call him back separately.

63.    On that separate call, Vanderveen again dissuaded Bruno from questioning Wells Fargo's fake interview practices or pursuing diversity initiatives. Vanderveen asserted that according to Barry Sommers, the CEO of Wells Fargo's Wealth & Investment Management business, Bruno's job was to focus on "recruiting, recruiting, recruiting" and nothing else. Vanderveen again threatened Bruno's job, telling him to "drop all other matters" and "I never again want to hear about the fake interviews, you understand?" or words to that effect. Vanderveen

explicitly instructed Bruno to do only what "the firm is asking you to do regarding diversity in your market. That's it … nothing more."

64.    In April of 2021, the Firm published its 2020 Social Impact and Sustainability Highlights reports proclaiming that 91% of applicable requisitions had a diverse interview slate. Then, in May of 2021, Scharf testified under oath before the United States Senate Committee on Banking, Housing and Urban Affairs, that the Firm has "implemented guidelines that require a diverse slate of candidates."

65.    But the Firm continued to conduct fake interviews that harmed diverse candidates. Separate and apart from the fake interviews that took place when teams sought to grow or change structure, Wells Fargo had a widespread practice of pre-selecting candidates for management positions. As with the teaming situations, the beneficiaries of the pre-selection were typically white. Unlike the team situation, there would be no official policy at Wells Fargo that allowed this kind of pre-selection.

66.    In June 2021, Wells Fargo conducted interviews for the South Florida Market Leader position. Wells Fargo had decided to combine the Boca Raton, Ft. Lauderdale, and Miami markets into one market, the South Florida market, which became the biggest market in the country.

67.    By any objective measure, the strongest candidate was a Latino man who had been successfully running the Miami market and was performing extremely well in that role, especially in recruiting—the most essential responsibility of a Market Leader. He was a proven leader with deep knowledge of the market, recruiting candidates, and the needs of the advisors and professionals.

68.    Nonetheless, the all-white decision-makers Vanderveen, Alexander, and Jim Hays—who was in charge of Wells Fargo's entire advisory and investment management business—instead selected a white man who lacked any relevant experience for the position.

69.    The selected candidate was an internal candidate who had no in-the-field branch manager experience, no complex experience or experience in the South Florida market, and no recruiting experience.

70.    Shortly after being selected for the position, the incoming South Florida Market Leader acknowledged his lack of experience and qualifications for the role, telling Bruno "I am going to need your help and lean on you for recruiting." Within a short period of time, the overwhelmed, newly hired, South Florida Market Leader requested and was granted a transfer back to his prior position.

71.    Bruno challenged the decision to hire a totally unqualified white man over an eminently qualified Latino for such an important role. He complained to Vanderveen and Alexander, explaining that there was no way this candidate would have been selected on the merits, and describing this as another example of Wells Fargo deciding to pre-select and hire white candidates behind closed doors and then conducting fake interviews to justify the decision after the fact.

72.    During the summer of 2021, with full knowledge that Bruno would not be silenced on the topic of fake interviews, Wells Fargo resolved to terminate Bruno.

73.    Garza, in a protective manner, told Bruno that Vanderveen was "not happy" because he was getting calls from human resources and human resources recruiting "that you are being too aggressive in your diversity campaign." Garza warned that Bruno was "pushing the fake interviews too strongly" and should "just let it go and do what you are good at, recruiting top financial advisors to the firm."

74.    For some time, Bruno had been actively managing the performance shortcomings of his Operations Manager, Matt Glass ("Glass").

75.     Bruno had tried different management coaching techniques to encourage Glass to improve his performance after Bruno received complaints about Glass from employees who reported to Bruno.

76.     For example, as part of one coaching session, Bruno discussed Glass's reluctance to interview two Black applicants for an open CA position that reported to Glass. While Glass agreed in his conversation with Bruno to include the candidates in the interview pool, Bruno learned that the candidates had been excluded by Glass, who purported to have determined that the candidates did not meet Glass's stated criteria for hire. Bruno elevated his advocacy for the inclusion of the two Black candidates to HR manager, Jennifer DeStephano, who sided with Glass. Bruno then had a conversation with DeStephano's boss, Debra Holder. Ultimately, with HR's permission, the two Black candidates were included after Glass's criteria were expanded.

77.     Glass resented Bruno's diversity initiatives, telling Bruno that it seemed that Bruno only wanted to hire Blacks or words to that effect.

78.     Thus, counseling Glass was a challenge as Bruno knew that Glass openly expressed hostility toward Bruno's efforts to implement meaningful diversity initiatives.

79.     Consistent with Wells Fargo's practices, Bruno began with oral counseling and shared with Glass the fact that Bruno had received complaints about Glass and tried to sternly encourage Glass to perform better. Bruno also tried to provide Glass with positive reinforcement in the hope that Glass would respond to the more favorable comments. The manner in which Bruno counseled Glass was no different than and consistent with Bruno's longstanding management style. Indeed, the way that Bruno spoke to Glass as well as Bruno's reliance on different management techniques was well known to Wells Fargo's HR team who were aware of Bruno's personality and style, Glass's performance issues and Bruno's coaching efforts.

80.     In the summer of 2021, Bruno learned of an anonymous HR complaint against him. When Bruno was questioned by HR about whether he only wanted to hire Blacks, Bruno correctly

assumed that the anonymous complaint involved Glass because Glass was the only Wells Fargo employee to make such outrageous assertions about Bruno's diversity initiatives.

81.    Rather than reject this ludicrous complaint and either terminate Glass for not supporting the Firm's purported diversity initiatives or send Glass to sensitivity training to understand the Firm's history of race discrimination, the reasons for the diversity initiatives, and the federal consent decree it was bound to follow, Wells Fargo embraced and weaponized Glass's complaints.

82.    During the investigation, Bruno asked if he could schedule a meeting with Glass, Glass's immediate supervisor, Rhonda Olds ("Olds"), Vanderveen and Bruno. HR approved Bruno's request. Thus, Olds, not Bruno, scheduled the meeting during which the three discussed Bruno's preexisting concerns about Glass's performance and Bruno's unwavering commitment to diversity. Vanderveen did not show up for the meeting. Bruno felt the meeting ended on a positive note and Glass agreed.

83.    Nonetheless, Glass then filed a new complaint with HR alleging the meeting that HR had approved was retaliatory. This complaint too was false.

84.    On August 16, 2021, Vanderveen called Bruno and told him he was terminated, effective immediately, for engaging in "retaliation."

85.    The retaliation accusation was false, absurd, and an extreme example of projection.

86.    In reality, Wells Fargo's reason for firing Bruno—who by all accounts and the objective metrics was an extremely effective Market Leader—was to retaliate *against* Bruno for repeatedly challenging Wells Fargo's practice of subjecting diverse candidates to fake interviews, for speaking candidly to Black job candidates about CEO Scharf's biased comments, for challenging the ridiculous decision to select an unqualified white man over a qualified Latino for the South Florida Market Leader position, and for pursuing in good faith initiatives that were

actually designed to increase Black representation at Wells Fargo, which was consistent with the *Slaughter* agreement.

87.    Wells Fargo's actions against Bruno stand in stark contrast to its celebration and longstanding tolerance of managers who violated the Firm's anti-discrimination and retaliation policies when they discriminated against Black applicants and employees. While Wells Fargo publicly proclaims that it terminated Bruno for violating its anti-discrimination and retaliation policies, Wells Fargo routinely finds "no corroboration" for complaints filed by women or Blacks for gender or race discrimination or retaliation. Upon information and belief, over 99 percent of complaints made by women or minorities for gender or racial discrimination result in no finding against the offender. For example, Vanderveen, who openly bullied and offended women and minorities and had a stack of HR complaints lodged against him, was never disciplined or terminated for his discriminatory treatment of women or minorities. Yet, when a white employee, Glass, made an unfounded and racially offensive complaint against his manager—who had been supportive of Black employees and was counseling Glass for work performance issues—Wells Fargo sustained and embraced the complaint and immediately terminated the employment of a successful, long-term executive, without any meaningful investigation.

88.    Bruno's treatment also stands in stark contrast to how Wells Fargo ultimately treated the individuals responsible for the company's racist and retaliatory practices and actions. Before he was terminated, Bruno complained to Wells Fargo's human resources department about the discriminatory and retaliatory practices described in this complaint. Wells Fargo did not investigate Bruno's allegations until after he was terminated. However, after his termination, Bruno shared with Wells Fargo investigators the discrimination, threats, retaliation, and other improper activity he witnessed and experienced at Wells Fargo. Shortly thereafter, and as a direct result of what Bruno reported to the investigators, Wells Fargo cleaned house of many of the individuals involved in the situation. Glass "resigned"; Vanderveen "resigned" just a few months after being promoted; and

Alexander "retired" from a position that he had described as his dream job. However, unlike Bruno, Wells Fargo allowed all three to leave voluntarily, and none of them were de facto blackballed from the financial industry as a result of being listed as a retaliator on their Form U5s. Nor did Wells Fargo spread false statements about these individuals to the press.

89.      By suddenly and illegally terminating Bruno's employment under false pretenses, Wells Fargo unilaterally and unjustly stripped him of his substantial unvested deferred compensation, depriving him of the benefits he had already earned through his outstanding work. In contrast, Alexander—who presided over Wells Fargo's fraudulent and discriminatory fake interview practices—was given the opportunity to "retire" in lieu of termination and keep his millions in  deferred compensation.

90.      Consistent with its contrasting treatment of Bruno—who advocated for legitimate diversity initiatives and opposed harmful sham initiatives—and those like Glass, who complained about efforts to hire Black candidates, and executives like Vanderveen and Alexander, who retaliated against Bruno for challenging Wells Fargo's fake interview practices, Wells Fargo recently systematically scrubbed from its website all language promoting diversity, equity, or inclusion.[11]

***After Wells Fargo's Fake Interview Practices Become Public, Triggering Another Legal, Regulatory, and PR Fiasco, Wells Fargo Further Retaliates Against Bruno***

91.      When a licensed financial industry employee's employment is terminated, the employer must file a "Form U5" with FINRA, describing the reasons for the employee's departure. In a defamatory act of further retaliation, Wells Fargo falsely asserted that Bruno was terminated for "workplace conduct inconsistent with Company standards relating to professionalism and anti-retaliation." This false accusation was published to every potential employer in the financial

---

[11] Daniel Johnson, *Wells Fargo Quietly Removes Page Detailing Its Long History of Diversity*, Black Enterprise, (Sept. 2, 2025), https://www.blackenterprise.com/wells-fargo-deletes-page-history-diversity/

industry and guaranteed that Bruno would never again work for a major firm in the industry, despite his deep experience and track record of success and objectively excellent performance.

92.    Not satisfied with destroying Bruno's successful career in the financial services industry, Wells Fargo further defamed, discriminated against, and retaliated against Bruno by violating its own personnel policies forbidding public dissemination of reasons for termination. In complete violation of Bruno's privacy and contractual rights, Wells Fargo recklessly, maliciously, and repeatedly disclosed to newspaper publications and others its false assertion that Bruno engaged in unlawful retaliation.

93.    Subsequently, in May 2022, the New York Times published a lengthy exposé on Wells Fargo's widespread practice of subjecting "diverse" candidates for fake interviews. Along with a dozen current and former Wells Fargo employees, Bruno spoke to the New York Times reporter who was investigating Wells Fargo's fake interview practices. Bruno was quoted in the exposé, so Wells Fargo was aware of his participation.

94.    The public exposure of Wells Fargo's fake interview practices triggered another massive public relations, regulatory, and legal fiasco for Wells Fargo.

95.    Wells Fargo's stock dropped precipitously in the wake of the New York Times story, triggering major shareholder class action lawsuits, accusing Wells Fargo of defrauding investors through its fake interview practices.[12]

96.    Wells Fargo's executives were irate that the New York Times published an exposé on the Firm's fake interview practices that featured Bruno's allegations.[13] The New York Times story went "viral" and caused a firestorm of adverse publicity for Wells Fargo regarding its

---

[12] Complaint, *In Re: Wells Fargo & Company Hiring Practices Derivative Litigation*, No. 3:22-cv-05173 (N.D. Cal. Sept. 9, 2022), Dkt. No. 1; Complaint, *SEB Investment Management AB et al. v. Wells Fargo & Co. et al.*, No. 3:22-cv-03811 (N.D. Cal. June 28, 2022), Dkt. No. 1.

[13] Emily Flitter, *At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interviews*, THE NEW YORK TIMES (May 19, 2022), https://www.nytimes.com/2022/05/19/business/wells-fargo-fake-interviews.html.

"Rooney Rule" and fake interviews. Former employees and applicants began to openly discuss their experiences with fake interviews on the internet and to file grievances with the Firm, the Equal Employment Opportunity Commission, and in court. Further, the United States Attorney's Office for the Southern District of New York notified Wells Fargo that it was conducting a criminal investigation into Bruno's allegations. The New York Attorney General also began its investigation into the fake interviews of diverse candidates.

97.    Members of Congress also voiced concerns about the fake interviews of diverse candidates. For example, Maxine Waters issued a press release entitled, Chairwoman Waters Calls on Regulators to Hold Wells Fargo Accountable for Troubling Patterns and Practices of Anti-Consumer Behavior, that referenced the fake interview scandal and declared it "unacceptable that Wells Fargo would mislead applicants and the public." Similarly, in September of 2022, CEO Scharf was interrogated by Congresswoman Waters during a hearing before the United States House of Representatives Committee on Financial Services about the Firm's interview of a Black applicant for a job that had already been filled by a white hire. Senators Brown, Menendez, and Warren issued a press release to hold Wells Fargo accountable for conducting misleading interviews with women and minority candidates. The trio wrote that "the information uncovered by the New York Times was highly offensive and suggestive of systemic bias and discrimination…."

98.    In the midst of this firestorm, Wells Fargo knew that it had to destroy Bruno's credibility. Determined to intimidate Bruno from further cooperating with the regulators, the Firm escalated its public defamation campaign against him—repeatedly casting Bruno not as the whistleblower who had championed the rights of Blacks but as the manager who was fired for retaliating against a poor performer who complained that Bruno only wanted to hire Blacks. As a result of his termination and the malicious campaign to further discriminate and retaliate against Bruno, no employer will hire Bruno to work in the financial services industry.

99.    Recognizing it could not legitimately defend either shareholder lawsuit—because the company did in fact have a widespread practice of subjecting "diverse" candidates to fake interviews for positions they had no chance of obtaining and did in fact defraud shareholders and the public about those practices—Wells Fargo paid massive settlements, totaling $185 million, in 2025 to resolve both class action cases.[14]

100.    Thus, by publicly and truthfully exposing Wells Fargo's fraudulent and racist fake interview practices, Bruno had played a role in further damaging Wells Fargo's deeply tarnished brand and costing the company more than $185 million.

101.    Just as Wells Fargo had retaliated against Bruno by ending his employment in 2021, it retaliated against Bruno again in 2025 after he sued the company and after the nine-figure class settlements were announced.

102.    If Wells Fargo believed it could reasonably defend the shareholder lawsuits, it could have done so. Instead, it settled for $185 million.

103.    Wells Fargo blamed Bruno for exposing its fake interview practices and costing the company nine figures in legal fees.

104.    Wells Fargo blamed Bruno for exposing its fake interview practices and causing the company massive reputational damage and triggering extreme regulatory scrutiny.

105.    Wells Fargo blamed Bruno for suing the company and challenging its blatantly retaliatory decision to terminate him.

106.    Wells Fargo, like most major corporations, has a policy of keeping personnel information confidential. It violates Wells Fargo's personnel policies to expose employee

---

[14] Lead Plaintiffs' Notice and Unopposed Motion for Preliminary Approval of Proposed Settlement and Memorandum in Support, *In Re: Wells Fargo & Company Hiring Practices Derivative Litigation*, Case No. 3:22-cv-05173 (N.D. Cal Oct. 15, 2025), Dkt. No. 254; Plaintiffs' Unopposed Mot. for Preliminary Approval of Settlement and Memorandum of Points and Authorities in Support Thereof, *SEB Investment Management AB et al. v. Wells Fargo & Co. et al.*, case number 3:22-cv-03811 (N.D. Cal Oct. 13, 2025), Dkt. No. 269

information, including the reasons for adverse personnel actions and terminations, to the news media.

107.    Having abandoned its doomed attempt to defend its fake interview practices in court, and having agreed to pay shareholders $185 million, Wells Fargo sought to punish Bruno for the damage he caused to the company by speaking truthfully about its racist practices. This time, more than four years after Wells Fargo retaliated against Bruno by firing him and making it impossible for him to find another comparable job in the financial industry, Wells Fargo affirmatively lied to the news media about the reason for his termination.

108.    Responding to requests for comment about the class-action settlements, Wells Fargo stated to multiple news outlets in October 2025 that Bruno "was fired" for "combative behavior."[15]

109.    Wells Fargo's statement to the news media that Bruno was "fired" for "combative behavior" was false, defamatory, and retaliatory.

110.    The word "combative" means "ready or eager to fight."

111.    During his two-plus decades of successful employment at Wells Fargo, Bruno did not engage in "behavior" that suggested he was "ready or eager to fight."

112.    Nor is it true that Bruno was "fired" for "combative behavior."

113.    In reality, Wells Fargo fired Bruno to retaliate against him for opposing the company's fake interview practices and supporting genuine diversity initiatives.

---

[15] Anwesha Mitra, *Wells Fargo Agrees to $85 Million Settlement Over 'Fake Interviews' for Diversity Candidates*, FINANCIAL EXPRESS, (Oct. 25, 2025), https://www.financialexpress.com/world-news/wells-fargo-agrees-to-85-million-settlement-over-fake-interviews-for-diversity-candidates-heres-what-happened/4021369/; *Wells Fargo to Pay $85M For Alleged Fake Interviews With Diverse Candidates,* BLACK INFORMATION NETWORK, (Oct. 24, 2025), https://birmingham.binnews.com/content/2025-10-24-wells-fargo-to-pay-85m-for-alleged-fake-interviews-with-diverse-candidates/; Ronnie Dungan, *$85m | Wells Fargo Counts the Cost of 'Fake' Diversity Interviews Lawsuit*, HR GRAPEVINE, (Oct. 24, 2025), https://www.hrgrapevine.com/us/content/article/2025-10-24-wells-fargo-counts-the-cost-of-fake-diversity-interviews-lawsuit; Samantha Dorsica, *Wells Fargo Agrees to Pay $85M Settlement Over Claims It Hosted Fake Job Interviews to Hit Diversity Goals*, YAHOO! FINANCE, (Oct. 22, 2025), https://finance.yahoo.com/news/wells-fargo-agrees-pay-85m-150008597.html

- 25 -
COMPLAINT

114.    Even Wells Fargo's own (false) justification for Bruno's firing was not that he engaged in "combative behavior." Instead, Vanderveen told Bruno that he was fired for "retaliation."

115.    As a direct and proximate result of Wells Fargo's unlawful actions, Bruno has suffered financial losses and permanent damage to his career.

116.    As a direct and proximate result of Wells Fargo's unlawful actions, Bruno has suffered emotional and mental distress, embarrassment and humiliation, loss of enjoyment of life, inconvenience, and other non-pecuniary losses.

117.    Punitive damages are appropriate because Wells Fargo's retaliatory conduct was malicious and/or recklessly indifferent to Plaintiff's protected rights.

## COUNT I

### Discrimination and Retaliation Under 42 U.S.C. § 1981

118.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

119.    42 U.S.C. Section 1981 makes it unlawful for an employer to discriminate or retaliate against an employee because that employee engaged in protected activity, such as reporting or challenging racial discrimination. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008).

120.    Plaintiff engaged in protected activity by reporting and challenging racial discrimination.

121.    Wells Fargo took adverse employment action against Plaintiff in retaliation for engaging in this protected activity.

122.    In addition, Wells Fargo engaged in further retaliation against Plaintiff after his employment at Wells Fargo ended.

123.    Plaintiff was subjected to and harmed by Wells Fargo's discrimination and retaliation after he reported, challenged, and opposed Wells Fargo's racially discriminatory conduct.

124.    As a direct and proximate result of Wells Fargo's conduct, Plaintiff has suffered damages.

**COUNT II**

**Discrimination and Retaliation in Violation of Title VII**

125.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

126.    Title VII of the Civil Rights of 1964, 42 U.S.C. § 2000e *et seq*., and amendments thereto ("Title VII"), make it unlawful for an employer to retaliate against an employee because that employee engaged in protected activity, such as filing a charge of discrimination against her employer or complaining to her employer about discrimination on the job. 42 U.S.C. § 2000e-3(a).

127.    Plaintiff engaged in protected activity by reporting and challenging racial discrimination.

128.    Wells Fargo took adverse employment action against Plaintiff in retaliation for engaging in this protected activity.

129.    Plaintiff was subjected to and harmed by Wells Fargo's discrimination and retaliation after he reported and challenged Wells Fargo's racially discriminatory conduct.

130.    As a direct and proximate result of Wells Fargo's conduct, Plaintiff has suffered damages.

131.    Plaintiff timely filed a Charge of Discrimination and Retaliation with the EEOC and has exhausted his administrative remedies.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court find against Wells Fargo as follows:

a.    Declare that Wells Fargo's acts, conduct, policies, and practices are unlawful and violate 42 U.S.C. § 1981 and Title VII;

b.     Award Plaintiff the value of all compensation and benefits that he has lost as a result of Wells Fargo's unlawful conduct;

c.     Reinstate Plaintiff or award Plaintiff the value of all compensation and benefits that he has lost as a result of Wells Fargo's unlawful conduct;

d.     Award Plaintiff compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of reputation, and other non-pecuniary losses;

e.     Award Plaintiff the value of forfeited deferred compensation;

f.     Award Plaintiff punitive damages;

g.     Award Plaintiff prejudgment interest and attorneys' fees, costs and disbursements, as provided by law;

h.     Award Plaintiff such other make whole equitable, injunctive and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiff;

i.     Award Plaintiff such other make-whole relief as this Court deems just and proper.

Respectfully submitted,

**STOWELL & FRIEDMAN, LTD.**

By:_____
        Linda D. Friedman (pro hac vice to be requested)
        Jared Calvert (pro hac vice to be requested)

**SANI LAW, APC**

By: */s/ Sam Sani*_____
        Sam Sani

        Attorneys for Plaintiff

COMPLAINT

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure and Civil Local Rule 3-6.

**STOWELL & FRIEDMAN, LTD.**

By:_____
  Linda D. Friedman (pro hac vice to be requested)
  Jared Calvert (pro hac vice to be requested)

**SANI LAW, APC**

By: _/s/ Sam Sani_____
  Sam Sani

  Attorneys for Plaintiff

COMPLAINT